IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MARIA L. McCLAIN**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15 C 6944 |
| | ) |
| **CITIMORTGAGE, INC.**, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

CitiMortgage, Inc. ("Citi") has filed a Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss portions of the First Amended Complaint ("FAC") brought against it by Maria L. McClain ("McClain"), and that motion has now been fully briefed by the parties and is accordingly ripe for decision. For the reasons that follow, Citi's motion is denied.

## Motion To Dismiss Standards

Under Rule 12(b)(6) a party may move for dismissal for the "failure to state a claim upon which relief can be granted." Familiar Rule 12(b)(6) principles require the district court to accept as true all of McClain's well-pleaded factual allegations and view them in the light most favorable to it as the non-moving party (Lavalais v. Vill. of Melrose Park, 734 F.3d 629, 632 (7th Cir. 2013)). But "legal conclusions or conclusory allegations that merely recite a claim's elements" are not entitled to any presumption of truth (Munson v. Gaetz, 673 F.3d 630, 632 (7th Cir. 2012)).

In the past decade the Supreme Court made an important change in the evaluation of Rule 12(b)(6) motions via what this Court regularly refers to as the "Twombly-Iqbal canon," a usage drawn from Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), as more finely tuned in

Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam), and Ashcroft v. Iqbal, 556 U.S. 662 (2009)). That canon has introduced the concept of "plausibility" into the analysis, and in that respect our Court of Appeals has "interpreted Twombly and Iqbal to require the plaintiff to provid[e] some specific facts to support the legal claims asserted in the complaint" (McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation marks omitted)). As McCauley went on to reconfirm, claimants "must give enough details about the subject-matter of the case to present a story that holds together" (id.).

Because the focus of Rule 12(b)(6) motions is on the pleadings, they "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" (Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). But a nonmovant has more flexibility, for it "may elaborate on [its] factual allegations so long as the new elaborations are consistent with the pleadings" (id.). This opinion evaluates Citi's motion in accordance with those principles.

**Facts**

McClain and her then husband John Holmes ("Holmes") purchased a property in 2006 and executed a mortgage in favor of Citi's predecessor KH Financial, L.P. (FAC ¶ 8).[1] In 2009 McClain and Holmes divorced and Holmes quitclaimed his interest in their property to McClain, who then retained sole title (FAC ¶ 9). McClain defaulted on the mortgage in 2011, and later

---

[1] This opinion cites to allegations in the FAC as "FAC ¶ --." Memoranda filed by the parties are cited "Mem. --," "Resp. Mem. --" or "Reply Mem. --," with prefixes of "M." and "C." for McClain and Citi respectively.

that year Citi (presumably having been assigned the mortgage by that time) commenced a foreclosure action in Illinois state court (FAC ¶¶ 10-11).

In February 2012 Citi offered McClain a loan modification under the Making Home Affordable program ("HAMP") (FAC ¶ 12). That modification required McClain to make three monthly payments of $1,860 each as part of a trial period plan (FAC ¶ 12). McClain signed the modification that same month and proceeded to make all three trial payments (FAC ¶¶ 15, 16). According to the terms of the agreement, her third payment brought the loan current and converted the trial modification into a permanent one (FAC ¶ 16).

McClain's experience with Citi then deteriorated significantly. In May 2012 Citi sent McClain a "Stipulated Partial Claim Agreement" incorrectly stating that McClain was in arrears to the tune of $23,887.48 plus fees (FAC ¶ 19). To bring the loan current on that premise, McClain was directed to execute a subordinate note in favor of the Department of Housing and Urban Development ("HUD") (FAC ¶ 20). McClain received that subordinate note three months later and called Citi to ask how it would affect her loan modification (FAC ¶¶ 24-25). Citi falsely responded that she needed to sign the subordinate note in order to complete the modification, and in reliance on that representation McClain did so promptly (FAC ¶¶ 25-26). Meanwhile McClain continued making monthly payments of $1,860 according to the terms of the modified loan, while on its part Citi continued treating the loan as delinquent and assessing fees accordingly (FAC ¶¶ 28-29).

In a further bizarre twist, on October 2, 2012 Citi sent McClain a new loan modification agreement that was substantially identical to the prior (and still effective) agreement (FAC ¶ 32). McClain mistakenly understood that latest missive to be the finalization of her prior agreement, so she signed and returned it (FAC ¶ 34). Soon after she signed that second modification

agreement Citi sent to McClain a <u>third</u> agreement dated October 12, 2012 (FAC ¶ 34). While it is unclear from the FAC whether McClain returned the third agreement, it hardly mattered because soon after that she received a fourth (!) modification agreement from Citi. That one was dated November 1, 2012 and had terms identical to the first three, except that it included a notary line (FAC ¶ 35). McClain duly signed, notarized and returned that fourth agreement (FAC ¶ 35). She continued to believe that her modification was finalized and continued making her modified monthly payments accordingly (FAC ¶ 36).

Shortly thereafter McClain received a letter dated November 5, 2012 from Citi's then attorney, Law Offices of Ira T. Nevel, LLC ("Nevel") (FAC ¶ 37), that read (the "sic" references denote a troubling level of carelessness that no lawyer should permit to go out of his or her office uncorrected):

> Attached please find the loss mitigation documents sent for your execution by our client. It was discovered that on [sic] your previously submitted documents was [sic] missing a signature and notary. Please note that Per [sic] FHA guidelines if borrowers are divorced they must provide Power of Attorney [sic] that states he/she has the authority to sign on his/her behalf in regards to the mortgage. If one of the borrowers has filed Bankruptcy [sic] they will need to provide a reaffirmation agreement. If one of the borrowers is deceased we will need a copy of the death certificate.

More importantly than those errors, much of that was flat-out erroneous in substantive terms. First, McClain <u>had</u> submitted a notarized modification agreement after Citi sent her a document with a notary line (FAC ¶ 39). And contrary to Nevel's representation that McClain needed to provide a power of attorney, each of the four loan modification agreements stated that if the original obligors were divorced and one spouse transferred the property to the other in the

divorce, "the spouse who no longer has an interest in the property need not sign…" (FAC ¶ 40).[2]

Notably in light of what follows, only one address appeared on the letter -- Nevel's (FAC Ex. H).

McClain responded to the Nevel letter with four letters of her own,[3] each directed to Nevel's address. Her first letter was dated November 14, 2012 and requested information on why Citi would require a power of attorney in light of the language quoted in the preceding paragraph of the text of this opinion (C. Mem. Ex. A). That letter also stated:

> Whenever I call CitiMortgage, I am told they cannot talk to me because I am in litigation. Whenever I call Ira T. Nevel's office no one will talk to me and I am told I am not a client of the Law Office.

After receiving no response from either Citi or Nevel (FAC ¶ 42), on December 7, 2012 McClain through her attorney sent Nevel a second letter (C. Mem. Ex. B). That letter provided documentation of McClain's divorce and asked if any further documentation would be required (C. Mem. Ex. B).

When McClain finally heard from Citi six days later, it was in a letter informing her that her loan modification was denied due to missing documents (FAC ¶ 44). McClain contacted Citi

---

[2] McClain has also alleged (FAC ¶ 40) that the letter was contrary to Federal Housing Administration guidelines. That legal assertion need not be discussed at this time.

[3] McClain did not attach those letters to her FAC, but Citi has attached them to its Memorandum. While Rule 12(b)(6) motions generally may attack only what was pleaded, Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993) teaches:

> Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.

Here McClain referred to the letters in her FAC (FAC ¶¶ 41, 47), and the legal force (if any) of those letters is clearly central to her theory of recovery. As such, those letters will be regarded as part of the pleadings for purposes of resolving Citi's motion.

to ask about that, and Citi advised her to continue making payments according to the terms of the modified loan (FAC ¶ 46). Citi did not respond to either of the letters McClain had sent.

On May 21, 2013 McClain's counsel sent Nevel a third letter (C. Mem. Ex. C). That letter again brought up the divorce issue and also requested:

> a statement from your client showing a breakdown of her arrearage itemizing interest, principal, escrow, and any fees associates [sic] with the account and crediting of all prior payments to date.

Neither Nevel nor Citi responded, and McClain's counsel followed up with a June 24, 2013 letter to Nevel that requested a response to the May letter (C. Mem. Ex. D). Citi's failure to respond to that letter (FAC ¶ 48) or any of the other three letters forms part of the factual basis for Count III of McClain's FAC.

## **Count III's Viability or Nonviability**

Citi has advanced three grounds for dismissal of McClain's Count III, alleging violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 et seq. ("RESPA").[4] First Citi contends that the letters McClain sent were not "Qualified Written Requests" ("QWRs"), as that term is defined in the statute, because they did not concern the servicing of her mortgage loan account. Next Citi asserts that McClain's letters did not trigger liability under RESPA because they were not sent to Citi's "exclusive" address. And finally Citi urges that McClain cannot recover because she mailed the letters to Citi's attorneys rather than to Citi directly. Before addressing each of those contentions in turn, this opinion will pause to describe briefly RESPA's relevant provisions.

---

[4] All citations to RESPA will take the form "Section --" without any need for repeated references to Title 12.

RESPA is a consumer protection statute that regulates the servicing and assignment of mortgage loans. Among the numerous duties the law imposes on loan servicers is the obligation, set out in Section 2605(e)(1)(A), to respond if they:

> receive[ ] a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of [the] loan. . . .

"Servicing" is defined in Section 2605(i)(3) as:

> receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

But in its implementation of RESPA, HUD's published response to public comments has rejected the notion that a QWR is somehow limited to account balance issues:

> The statute encompasses all information relating to the servicing of a mortgage loan and does not restrict the subject matter to questions concerning the transfer of servicing, installment payments, or account balances.

In addition to requiring that a QWR relate to servicing, RESPA's Section 2605(e)(1)(B) also requires that it:

> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

Catalan v. GMAC Mortgage Corp., 629 F.3d 676, 687 (7th Cir. 2011) has adopted an expansive approach in interpreting that subsection:

> RESPA does not require any magic language before a servicer must construe a written communication from a borrower as a qualified written request and respond accordingly. The language of the provision is broad and clear. To be a qualified written request, a written correspondence must reasonably identify the borrower and account and must "include a statement of the reasons for the belief

of the borrower, <u>to the extent applicable</u>, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B) (emphasis added). Any reasonably stated written request for account information can be a qualified written request. To the extent that a borrower is able to provide reasons for a belief that the account is in error, the borrower should provide them, but any request for information made with sufficient detail is enough under RESPA to be a qualified written request and thus to trigger the servicer's obligations to respond.

That approach informs this Court's analysis of Citi's first asserted ground for dismissal.

### 1. Whether McClain's Letters Constituted QWRs

As an initial ground for seeking dismissal of McClain's Count III, C. Mem. 7-8 submits that the letters McClain sent to Nevel did not constitute QWRs because they amounted to requests for a loan modification and thus did not concern the servicing of an existing loan. But that simply is not the case: McClain's well-pleaded allegations assert that she had already obtained a loan modification <u>before</u> sending any of the putative QWRs (FAC ¶¶ 15-16). Citi's argument on that score is therefore rejected summarily.

But even when the letters are treated as having concerned an existing loan (certainly a plausible reading), to qualify as QWRs they must still have concerned the servicing of that loan (Section 2605(e)(1)(A)) and must have included either a request for information or a notice of error (Section 2605(e)(1)(B)). Before those issues are discussed as to each letter, the context in which the letters were sent bears reiteration: McClain sent those letters in response to Nevel's November 5, 2012 correspondence (FAC Ex. H) that said McClain's previously submitted documents were missing a notary signature and power of attorney. That left McClain confused because she had been making, and Citi had been accepting, reduced payments pursuant to a valid loan modification agreement that did <u>not</u> require a power of attorney or notarial signature (FAC

¶¶ 36, 38-40, 43, 46). Hence McClain's four letters properly sought clarification as to the status of her modification and whether further documentation was needed.

McClain's first letter, dated November 14, 2012, stated why she believed the power of attorney requirement was in error and sought information on "what is truly required of me" to comply with the terms of the loan modification (C. Mem. Ex. A). Next her December 7, 2012 letter reiterated the same argument about the power of attorney requirement and asked that Nevel "advise if you need any further information or documentation . . ." (C. Mem. Ex. B). Each of those letters can surely be viewed as a "reasonably stated written request for account information" (Catalan, 629 F.3d at 687) as to whether her modification was in place. Alternatively they can be characterized as notifying Citi that any failure to treat the loan as modified due to missing documentation would be in error. Under either view those letters concerned servicing, because the question of whether a modification was in place impacted on (indeed it determined) how McClain's payments were being applied and whether Citi was assessing default-related fees.

McClain's third and fourth letters also requested information about Citi's servicing.[5] Her third letter (C. Mem. Ex. C), sent on May 21, 2013, asked for:

> a statement from your client showing a breakdown of her arrearage itemizing interest, principal, escrow, and any fees associates [sic] with the account and crediting of all prior payments to date.

---

[5] Citi acknowledges in its R. Mem. 8 that the May 21, 2013 letter requested an accounting but argues that the letter constituted a settlement communication rather than a RESPA inquiry. But Citi cites no authority and provides no explanation as to why a settlement communication cannot also constitute a QWR if the relevant requirements are met.

And her fourth and final letter was dated June 24, 2013 and simply requested a response to her May letter (C. Mem. Ex. D.) As both of those letters sought information on "payment of principal and interest" (Section 2605(i)(3)), they clearly related to servicing -- just as did the earlier two.[6] Citi's first asserted ground for dismissal must therefore fail.

**2.   Whether Citi Designated an Exclusive Address**

To aid servicers in complying with RESPA, the statute's implementing regulations (24 C.F.R. § 3500.21(e)(1) ("Section 3500.21")[7] allow that:

> By notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may establish a separate and exclusive office and address for the receipt and handling of qualified written requests.

Citi asserts that it established such an address by sending McClain a mortgage statement dated April 8, 2015 (C. Mem. Ex. E)[8] that included the following language on its second page:

---

[6] To be sure, McClain's third letter coupled her renewed argument that she had already provided the necessary materials with a request for information on what additional documentation needed to be submitted. But that was a wholly understandable response to the problem created by Citi when it "denied" the modification (FAC Ex. I) months after McClain's trial modification had already been converted into a permanent one (FAC ¶¶ 15-16). In any event those letters cannot be regarded as mere requests for loan modifications, and the cases that C. Mem. 7-8 cites for the proposition that mere requests for modifications cannot constitute QWRs are entirely beside the mark.

[7] Rulemaking authority for RESPA was transferred by the Dodd-Frank Act from HUD to the Consumer Financial Protection Bureau (see Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg. 34224-01 (June 16, 2014)) and new regulations took effect in 2014 (see 12 CFR § 1024.35(c)) -- but there is no dispute that Section 3500.21 is applicable to the conduct at issue here.

[8] As was true of McClain's four letters (see n.3), Citi's 2015 mortgage statement was not attached to the FAC but rather to Citi's Memorandum. In justifying that inclusion C. Mem. 5 n.5 asserts that "Plaintiff discusses [Citi's] statements in FAC ¶ 66(d)." Although that statement is really a stretch given what is actually alleged in FAC ¶ 66(d), McClain has not objected to Citi's reliance on the document, so neither will this Court.

> In accordance with federal law, CitiMortgage has designated the following address where you can send a written request for information, a written notice of error, or a qualified written request:
>
> > CitiMortgage, Inc.
> > Attn: Customer Research Team
> > P.O. Box 10002
> > Hagerstown, MD 21747-0002

C. Mem. 5 astonishingly urges that McClain's not having sent her four letters to that address dooms her recovery.

Like all too many of Citi's contentions already dealt with and to be dealt with hereafter, that argument borders on the outrageous (or, indeed, has crossed that border and entered into the realm of outrageousness). First and most obviously, the mortgage statement on which Citi seeks to rely is dated April 8, 2015, while the letters at issue were all sent in 2012 or 2013. Citi has quite understandably pointed to no authority to support the mind-boggling notion that the designation of an exclusive address could possibly be retroactive in effect.[9] Moreover, the 2015 mortgage statement itself cannot defeat McClain's recovery because it did not "establish a separate and exclusive office" as required in Section 3500.21. All that the letter said was that McClain "can" send a written request to the Hagerstown address, and that language is plainly

---

[9] C. Reply Mem. 8 attempts to point to other cases in which Citi designated QWR addresses "as early as 2008" in an effort to suggest that McClain received notice of the address earlier than 2015. But that argument appears even more specious (if possible) than the notion of retroactivity just rejected in the text. Citi can provide no predicate whatever for its conduct <u>with respect to other borrowers</u> to be relevant to when <u>McClain</u> received notice. And note particularly that it was Citi itself that introduced into the record the <u>2015</u> mortgage statement (see n.8), though it presumably had access to all of the statements it had sent to McClain.

insufficient to put McClain on notice that the address is exclusive, so that Section 3500.21 may be invoked.[10] So Citi's second candidate for a dismissal ruling is also rejected.

**3.   Whether QWRs May Be Mailed to Citi's Counsel**

C. Mem. 6 continues Citi's futile onslaught on Count III by asserting that McClain cannot recover under RESPA because she (and her attorneys) mailed the QWRs to Citi's counsel rather than to Citi directly. That contention is sought to be based on Section 2605(e)(1)(A), which authorizes either a borrower or her agent to send a QWR but "does not similarly state that QWRs may be received by either a servicer or a servicer's agent" (C. Mem. 6). As Citi would have it QWRs must be mailed directly to the servicer in order to trigger a response requirement (id.).

But this time Citi attempts to read into the statute a requirement that appears nowhere in its text, which states only that a servicer's duty to respond is triggered by its receipt of the QWR -- not by the borrower mailing the QWR to a particular recipient (Section 2605(e)(1)(A)). Indeed, our Court of Appeals had occasion to address that very issue in Catalan, where a frustrated borrower had mailed a letter to HUD that HUD then forwarded to the servicer, GMAC Mortgage. Catalan, 629 F.3d at 688 expressly held that the letter constituted a QWR under RESPA:

> The statute requires that qualified written requests be received "from the borrower (or an agent of the borrower)." 12 U.S.C. § 2605(e)(1)(A). We do not have

---

[10] In evaluating a factually similar case (Catalan v. RBC Mortgage Co., No. 05 C 6920, 2008 WL 2741159, at *8 (N.D. Ill. July 8) (internal quotation marks omitted)), this Court's colleague Honorable Robert M. Dow, Jr. (ironically a distinguished alumnus of the same law firm that represents Citi here) sensibly observed that to invoke Section 3500.21 the servicer's notice must:

> be separate and must advise customers of a separate and exclusive address that they must use for the mailing of inquiries regarding the servicing of their mortgage loans.

difficulty interpreting that requirement, under the circumstances of this case, to include HUD's intercession on the plaintiffs' behalf. RESPA is a consumer protection statute, and on summary judgment we must view the facts in the plaintiffs' favor. Here, the record amply demonstrates that the plaintiffs had exhausted every reasonable avenue in their communications with RBC, yet in the fall of 2004, they were back in the same nightmare with a different company. . . . After the months the plaintiffs had spent writing to and getting nowhere with RBC, and due to the fact that GMAC Mortgage received the plaintiffs' October 6th letter and treated it as a payment dispute and as a request for information, the fact that GMAC Mortgage received the letter from HUD and not directly from the plaintiffs does not prevent the plaintiffs' October 6th letter from being a qualified written request under RESPA.

That decision stands squarely for the proposition that a servicer cannot defeat a borrower's recovery under RESPA based on a strained reading of the statute under which the borrower or her agent is invariably compelled to mail the QWR directly to the servicer.[11] Rather, if the servicer receives a QWR by a different route called for by the circumstances of the case, that QWR will trigger a response requirement notwithstanding how it reached the servicer.[12]

That same principle clearly calls for the rejection of this asserted ground for dismissal. Indeed, in her dealings with Citi McClain experienced exactly the kind of "nightmare" (629 F.3d at 688) that led <u>Catalan</u> to reject the labored reading of RESPA advanced here. That nightmare was created after McClain had already obtained a loan modification (FAC ¶¶ 15-16) and Citi

---

[11] Note that <u>Catalan</u>, 629 F.3d at 688 never suggested that it was treating HUD as an agent of the mortgagor for purposes of interpreting Section 2605(e)(1)(A). Any such treatment would have rendered superfluous the fact-dependent analysis quoted earlier in the text.

[12] One of the letters alleged to be a QWR in <u>Catalan</u>, 629 F.3d at 684 was sent from the borrower to GMAC Mortgage's foreclosure counsel rather than to GMAC Mortgage directly. Though GMAC Mortgage does not appear to have taken Citi's present path by raising that issue as a potential bar to the borrower's recovery, it is worth noting that our Court of Appeals found the letter was "unequivocally a qualified written request under RESPA" (<u>id.</u> at 689).

- 13 -

began inundating her with contradictory, error-riddled letters that left her bewildered as to whether her modification was actually in place (FAC ¶¶ 19-36).  When McClain then turned to Citi for help, she was told to communicate only through Citi's lawyers, but those lawyers proved no more helpful.  They sent McClain their own error-riddled letter that identified the documents "we will need" and that included only one address -- the law firm's (FAC Ex. H).  Under those circumstances this Court has no problem drawing the reasonable inference that Citi ultimately received the QWRs that McClain sent to its counsel <u>at</u> <u>their</u> <u>request</u>.  And that receipt, when coupled with McClain's near-Kafkaeque experience in her dealings with Citi, places this case on all fours with <u>Catalan</u>, whose clear holding torpedoes Citi's third and final ground for dismissal.[13]

**<u>Conclusion</u>**

As this opinion has made plain, not one of the reasons proffered on Citi's behalf justifies the threshold rejection of the RESPA-based theory of recovery advanced in FAC Count III.  Hence Citi's motion to dismiss Count III is denied, and Citi is ordered to answer that Count on or before February 5, 2016.  Finally, the parties' counsel who authored and who opposed that motion are ordered to appear in court at 8:45 a.m. February 8, 2016.

_____
Milton I. Shadur
Senior United States District Judge

Date:  January 21, 2016

---

[13]  It should be added that unlike the borrower in <u>Catalan</u>, McClain not only "exhausted every reasonable avenue" (629 F.3d at 688) in communicating with Citi but was actually directed by Citi to communicate only through its counsel.  Citi's present attempt to defeat McClain's recovery because she followed those very directions takes real chutzpah -- a subject that is taken up further in this opinion's conclusion.